**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-2573 & 22-2186
_____

ANTHONY L. VIOLA,
Appellant

v.

UNITED STATES DEPARTMENT OF JUSTICE,
FEDERAL BUREAU OF INVESTIGATION,
Records/Information Dissemination Section; UNITED
STATES DEPARTMENT OF JUSTICE, Executive Offices
for the United States Attorneys-Freedom of Information &
Privacy Staff; CUYAHOGA COUNTY MORTGAGE
FRAUD TASK FORCE; KATHRYN CLOVER
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 1:15-cv-00242)
District Judge:  Honorable Susan Paradise Baxter
_____

Argued:  July 13, 2023

Before:  PHIPPS, McKEE, and RENDELL, *Circuit Judges*

(Filed: November 3, 2025)
_____

Alan Chen            **[ARGUED]**
Daniel Mejia-Cruz
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511

Tadhg Dooley
David R. Roth
WIGGIN & DANA
One Century Tower
265 Church Street
New Haven, CT 06510

            *Counsel for Appellant*


Laura S. Irwin
OFFICE OF UNITED STATES ATTORNEY
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Sharon Swingle
Daniel Winik            **[ARGUED]**
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION APPELLATE
950 Pennsylvania Avenue NW
Washington, DC 20530

            *Counsel for Appellees United States*
            *Department of Justice, Federal Bureau of*
            *Investigation, Records/Information*
            *Dissemination Section and United States*
            *Department of Justice, Executive Offices for the*
            *United States Attorneys-Freedom of*
            *Information & Privacy Staff*

Jake A. Elliott    **[ARGUED]**
CUYAHOGA COUNTY PROSECUTOR'S OFFICE
1200 Ontario Street
8th Floor
Cleveland, OH 44113

*Counsel for Appellee Cuyahoga County
Mortgage Fraud Task Force*

————————

OPINION OF THE COURT

————————

PHIPPS, *Circuit Judge*.

After an Ohio man was investigated by a county-specific mortgage fraud task force, he was charged in federal court with three dozen counts related to mortgage fraud. Following a trial, the jury found him guilty of all but one of those counts. The man was also charged in Ohio state court with fifty-two counts related to the same underlying conduct. The state-court jury, however, acquitted the man of all counts.

The disparity in those outcomes prompted the man, while incarcerated, to look for evidence of governmental misconduct associated with his federal convictions. As part of his efforts, he submitted requests under the Freedom of Information Act to two federal agencies. *See* 5 U.S.C. § 552. Neither agency produced any records within the statutory response time, and the man, then imprisoned in Pennsylvania, filed a civil enforcement action against those agencies in the District Court. After the litigation commenced, both agencies began producing responsive records, and the man then moved to amend his complaint to add as a defendant the county-specific task force that had originally investigated him for mortgage fraud. The District Court permitted that amendment, but it

3

later granted the task force's motion to dismiss for a lack of personal jurisdiction. The two federal agencies filed a joint dispositive motion, and the District Court entered summary judgment in their favor. In this appeal, the man challenges the District Court's rulings with respect to the task force and the two federal agencies.

For the reasons below, we will affirm the dismissal of the county-specific task force for a lack of personal jurisdiction, and we will affirm in part and vacate in part the entry of summary judgment in favor of the federal agencies. The vacated matter will be remanded to the District Court for proceedings consistent with this opinion, and we will not retain jurisdiction over the case while on remand.

## I. FACTUAL BACKGROUND

In September 2007, the Ohio Organized Crime Investigations Commission, a division of the Ohio Attorney General's Office, established the Cuyahoga County Mortgage Fraud Task Force pursuant to Ohio law. *See* Ohio Rev. Code Ann. § 177.02(B) (West 1999). The Task Force consisted of six state and local law enforcement organizations that agreed in 2008 to combat organized mortgage fraud in Cuyahoga County by assigning their personnel to the Task Force.[1] In addition to its participating agencies, the Task Force recognized the cooperation of additional federal, state, and local agencies, including the Federal Bureau of Investigation and the United States Attorney's Office for the Northern

---

[1] Those organizations were the Cleveland Heights Police Department; the Office of the Prosecuting Attorney for Cuyahoga County; the Cuyahoga County Sheriff's Office; the Pepper Pike Police Department; the Cleveland Police Department; and the Bureau of Criminal Identification and Investigation within the Ohio Attorney General's Office.

4

District of Ohio, both of which are agencies within the United States Department of Justice.[2]

The Task Force's investigative jurisdiction was limited to Cuyahoga County, and as part of its mission, the Task Force cooperated with the FBI to investigate Anthony Viola for mortgage fraud in connection with nineteen properties there. Viola, who lived in Cleveland Heights, Ohio, at the time, held ownership interests in four businesses – Realty Corporation of America, Central National Mortgage, Title Network of America, and American Title Network. He was also the president of Realty Corporation of America and a manager of Transcontinental Lending Group.

The investigation into Viola led to his prosecutions in federal court and state court. At the federal level, a grand jury in the Northern District of Ohio indicted him in May 2009 on thirty-four counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. At the state level, Viola was charged in the Cuyahoga County Common Pleas Court in May 2010 with fifty-two counts of violating several provisions of Ohio law related to mortgage fraud, including records tampering, receipt of stolen property, and money laundering. *See* Ohio Rev. Code Ann. §§ 1315.55, 2913.02(A), 2913.05, 2913.42, 2913.51, 2923.32. Viola maintained his innocence and pleaded not guilty to all of the charges against him in both cases.

In February 2011, the federal case went to trial. The jury returned a verdict of guilty on thirty-five of the counts and not

---

[2] The other cooperating agencies were the Office of the Recorder for Cuyahoga County; the Office of the Auditor for Cuyahoga County; the Office of the Treasurer for Cuyahoga County; the Ohio Department of Commerce; the United States Department of Housing and Urban Development; and the United States Postal Inspection Service.

guilty on one count of wire fraud. Viola later received a 150-month prison sentence for those crimes consisting of 60-month terms for the conspiracy charges and 150-month terms for the wire-fraud charges – all to run concurrently.

In the time between the guilty verdict and Viola's federal sentencing hearing, yet still before the trial in state court, the former Office Manager for the Task Force, Dawn Pasela, contacted Viola. Pasela, who was in her mid-twenties and who had been released from her position with the Task Force for absenteeism, told Viola that the prosecutors had engaged in misconduct by impermissibly destroying evidence and by directing her to surreptitiously record their post-indictment conversations with Viola to gain insight into his defense strategy.

In 2012, before his trial on the state charges began, Viola identified Pasela on his witness list and subpoenaed her to testify. According to her father, two Task Force agents then visited Pasela at her apartment, told her to leave Ohio for a while, and indicated that if she testified for Viola, she could be charged with federal crimes. Pasela then temporarily moved in with her parents but later returned to her apartment. She did not, however, appear to testify at trial at the designated time, and the state court issued a bench warrant to compel her appearance. After Pasela contacted the state court to explain her concerns about testifying, it recalled the bench warrant, and the trial proceeded without her testimony. Within a week, and while the jury was deliberating, Pasela's father found her dead in her apartment, and the cause of death was later listed as acute alcohol intoxication. Even without Pasela's testimony, Viola was acquitted on all counts.

In April 2013, while serving his federal sentence in prison in Ashland, Kentucky, Viola made a request for records to the FBI under the Freedom of Information Act, as amended, commonly abbreviated as 'FOIA.' *See* 5 U.S.C. § 552. His FOIA request sought records from October 1, 2008, through

6

December 31, 2012, that referenced his name or his acquittal in state court. He also requested records related to the seizure of the trash from his Cleveland Heights home as well as Dawn Pasela's recordings of him. In addition, Viola requested emails from Kathryn Clover, a witness who testified against him at both trials, as well as reports of witness interviews made by the FBI, technically designated as 'FD-302s' but commonly referred to as 'FBI-302s,' that mentioned his name and were prepared after March 1, 2011. Viola further requested records regarding Pasela's death.

In September 2014, after he had been transferred to Federal Correctional Institution McKean in the Western District of Pennsylvania, Viola submitted a FOIA request to the Executive Office for United States Attorneys, an agency within the Department of Justice. In that request, Viola sought records "concerning [his] criminal case or any matters involving [him] or [his] company." EOUSA FOIA Req. (JA125). That request, however, did not identify his company by name.

By October 2015, after several rounds of correspondence with each agency, including a successful administrative appeal of the FBI's assertion of a blanket exemption for open investigatory files, Viola had not received any records in response to his requests. At that point, Viola was deemed to have exhausted the administrative process, *see* 5 U.S.C § 552(a)(6)(C)(i), and he elected to initiate a *pro se* FOIA suit against EOUSA and the FBI in the Western District of Pennsylvania, which had subject-matter jurisdiction over the case.[3]

---

[3] It is unnecessary to decide whether the source of subject-matter jurisdiction is the general federal question statute, 28 U.S.C. § 1331, or a provision in FOIA that mentions jurisdiction, 5 U.S.C. § 552(a)(4)(B). The case arises under FOIA, a federal statute, so there is federal question jurisdiction. *See* 28 U.S.C. § 1331. And even if the reference in FOIA to

7

## II. PROCEDURAL HISTORY

While Viola's suit was pending, the agencies began producing records in response to his FOIA requests. In October 2016, EOUSA asserted that it had produced all responsive records. Its accompanying production consisted of 103 pages released without redactions and seventy-seven pages released subject to redactions based on the exemptions permitted by FOIA. *See generally* 5 U.S.C. § 552(b)(1)–(9). In February 2017, the FBI completed its production of 647 pages in full and 738 in part. Each agency also produced a *Vaughn* index – a document identifying the FOIA exemptions asserted for each of the redactions and withholdings.[4] EOUSA's *Vaughn* index indicated that it withheld 649 pages in full, and the FBI's *Vaughn* index indicated that it withheld 1,169 pages in full.

While the agencies were producing records, and based on the FBI's partial production, Viola moved to amend his complaint to add two new parties: the Task Force and Kathryn

---

jurisdiction is read as conferring exclusive jurisdiction on certain identified federal courts, the District Court would still have had subject-matter jurisdiction because Viola, by virtue of his incarceration, resided in the Western District of Pennsylvania at the time he initiated this lawsuit. *See* 5 U.S.C. § 552(a)(4)(B).

[4] *See Coastal States Gas Corp. v. Dep't of Energy*, 644 F.2d 969, 972 (3d Cir. 1981) ("A *Vaughn* index is a procedural tool developed in *Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), . . . to enable a district court to evaluate allegations of exemption advanced by a governmental agency, and to assure that claimed exemptions are justified under [FOIA]."); *see also Biear v. Att'y Gen.*, 905 F.3d 151, 154 (3d Cir. 2018) ("[A] *Vaughn* index[ is] an itemized index specifying the basis for withholding on a document-by-document basis.").

Clover.  *See* Fed. R. Civ. P. 15(a).  The District Court granted that motion.

Both newly added defendants then filed motions to dismiss. They sought dismissal for a lack of personal jurisdiction, *see id.* 12(b)(2), and they moved to dismiss for a failure to state a claim upon which relief could be granted on the theory that they were not federal agencies subject to FOIA, *see id.* 12(b)(6).

Those motions were assigned to a Magistrate Judge, who issued a report and recommendation in favor of granting the motions.  *Viola v. U.S. Dep't of Just.*, 2017 WL 10294380, at *1 (W.D. Pa. Aug. 8, 2017).  After Viola objected to that report and recommendation, the District Court agreed with the dismissal of Clover but vacated the dismissal as to the Task Force and referred that motion back to the Magistrate Judge. *Viola v. U.S. Dep't of Just.*, 2017 WL 10294379, at *2 (W.D. Pa. Sept. 28, 2017).

While those issues were being briefed, EOUSA and the FBI filed a joint dispositive motion on Viola's FOIA claims.  The two agencies included, as exhibits to that motion, sworn statements that addressed the adequacy of their searches for responsive records and the exemptions identified in the *Vaughn* indexes.

Once the briefing was complete, the Magistrate Judge issued a report and recommendation to dismiss the Task Force for a lack of personal jurisdiction, *Viola v. U.S. Dep't of Just.*, 2018 WL 4599877, at *4–5 (W.D. Pa. May 11, 2018), and to enter summary judgment in favor of EOUSA and the FBI, *id.* at *7.  The District Court adopted the Magistrate Judge's report and recommendation.  *Viola v. U.S. Dep't of Just.*, 2018 WL 4599859, at *1 (W.D. Pa. June 11, 2018).

Through a timely notice of appeal of that final decision, Viola invoked this Court's appellate jurisdiction.  *See*

9

28 U.S.C. § 1291. While that appeal was pending, EOUSA alerted this Court to its discovery of inaccuracies in its *Vaughn* index and requested a voluntary remand for correction of those errors. This Court granted that request for a partial remand but retained jurisdiction over the remainder of the appeal, which was then stayed. Around that time, the District Court appointed Viola *pro bono* counsel.[5] While that remand was pending, the FBI filed a motion in this Court to expand the scope of remand based on its discovery of additional responsive records – it had excluded some electronic files from its search – and this Court granted that motion but again retained jurisdiction.

Each agency significantly supplemented its production during the partial remand. EOUSA withdrew some of its withholdings and, subject to both new and revised exemptions, produced 267 pages in full and 225 pages in part. The FBI did not assert any new exemptions, but it provided additional records – its updated production consisted of 1,099 pages in full and 1,099 pages in part. Both agencies again each provided a *Vaughn* index for their supplemental productions. According to those indexes, in total, EOUSA withheld 278 pages in full and the FBI withheld 6,877 pages in full. After briefing on the supplemental productions, the District Court reaffirmed its grant of summary judgment to EOUSA and the FBI. *Viola v. U.S. Dep't of Just.*, 2022 WL 2374315, at *1 (W.D. Pa. June 10, 2022).

Viola again filed a timely notice of appeal, and this Court lifted its stay of the original appeal and consolidated the stayed case with the newly filed appeal. He now disputes the dismissal of the Task Force for a lack of personal jurisdiction

---

[5] The Court expresses gratitude for the *pro bono* services provided by appointed counsel, in particular to Alan Chen and Daniel Mejia-Cruz of the Yale Law School Advanced Appellate Litigation Project, for their commendable advocacy.

and the entry of summary judgment in favor of EOUSA and the FBI.

## III.    DISCUSSION

### A. The  District  Court  lacked  personal jurisdiction over the Task Force.

The District Court dismissed Viola's claim against the Task Force on the ground that it lacked personal jurisdiction over the Task Force. *Viola*, 2018 WL 4599859, at *1 n.1. Viola now disputes that ruling. He attempts to meet his burden of demonstrating personal jurisdiction, not by relying on any relationship that the Task Force had with Pennsylvania,[6] but rather by arguing that the Task Force waived any challenge to personal jurisdiction.[7] Viola's theory of waiver is somewhat novel and consists of two parts: first, he argues that the Task Force is a federal agency, and second, he contends that FOIA,

---

[6] *See generally Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (explaining that a federal court's power over a defendant depends on "the nature and extent of 'the defendant's relationship to the forum State'" (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017))); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (observing that in civil cases, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons"); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) ("Once challenged, the plaintiff bears the burden of establishing personal jurisdiction.").

[7] *See generally Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *cf.* Fed. R. Civ. P. 12(h)(1) (stating that a challenge to personal jurisdiction, venue, process, and service of process may be waived); 2 *Moore's Federal Practice* § 12.31[3] (2025).

by authorizing suits against federal agencies in certain district courts, *see* 5 U.S.C. § 552(a)(4)(B), waives personal jurisdiction for federal agencies, *cf.* Fed. R. Civ. P. 4(k)(1)(C) (providing that personal jurisdiction can be established as "authorized by a federal statute").

For the first part of his argument, Viola contends that the Task Force is a federal agency because it receives federal funding and is subject to federal supervision. In *Forsham v. Harris*, 445 U.S. 169 (1980), the Supreme Court preserved the possibility that in some rare circumstances, a non-governmental entity may constitute an agency for purposes of FOIA by virtue of its receipt of federal funding coupled with "extensive, detailed, and virtually day-to-day supervision" by the federal government. *Id.* at 180. *But cf. United States v. Orleans*, 425 U.S. 807, 817 (1976) (explaining that the federal government does not create a federal agency just by "giv[ing] counsel and help" and "mak[ing] available substantial assistance" (citation omitted)). The *Forsham* case, however, involved a group of private physicians and scientists who received federal grants; it did not concern units of state and municipal government, much less a task force comprised of such organizations. Thus, by its own terms, *Forsham* does not apply here, and extending it to these circumstances would blur federalism principles by opening the possibility that, at least for purposes of FOIA, units of state and local government could simultaneously be federal agencies. That is far beyond the text of the FOIA statute,[8] so the narrow loophole left open

---

[8] *See* 5 U.S.C. § 552(f)(1) (defining the term 'agency' for purposes of FOIA primarily through a cross-reference to a definition in the Administrative Procedure Act, *see* 5 U.S.C. § 551, but then supplementing it to "include[] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency"); *id.* § 551(1) (defining 'agency' as "each

by *Forsham* cannot be widened here: federal funding and supervision are not sufficient to transform a state or local governmental entity into a federal agency. And without the ability to demonstrate that the Task Force constitutes a federal agency for purposes of FOIA, Viola fails in his challenge to the District Court's dismissal of the Task Force for lack of personal jurisdiction.[9]

## B. Viola's Civil Enforcement Action

The remainder of Viola's case seeks relief permitted by FOIA's civil enforcement provision – an injunction of the agencies from withholding records and an order for the production of agency records improperly withheld. *See* 5 U.S.C § 552(a)(4)(B). But he did not move for summary judgment; only the agencies did. *See* Fed. R. Civ. P. 56(b). And in doing so, they argued that they discharged their FOIA search obligations and that each of their specific redactions and withholdings in full of records was justified such that Viola was not entitled to any relief. The District Court was persuaded by the agencies' positions and entered summary judgment in their favor. *Viola*, 2018 WL 4599859, at *1; *Viola*, 2022 WL 2374315, at *1. Viola now disputes that conclusion. Specifically, he challenges the adequacy of the searches that the agencies performed for responsive records, their assertions

---

authority of the Government of the United States, whether or not it is within or subject to review by another agency").

[9] In light of this conclusion, it is unnecessary to review the factual record to determine whether the Task Force actually received federal funding or was under any form of federal supervision. It is likewise unnecessary to address the second part of Viola's argument, whether FOIA waives personal jurisdiction for federal agencies. And while the lack of personal jurisdiction ends the matter, Viola did not submit a FOIA request to the Task Force, so it is hard to envision a scenario in which his FOIA claim against the Task Force could succeed.

of Exemptions 6, 7(C), 7(D), and 7(E), and their justifications for withholding responsive documents in full. In addition, Viola argues that the District Court did not adequately explain its rationale for granting summary judgment.

> ### 1. EOUSA's search for records responsive to Viola's FOIA request was adequate; the FBI's search was not.

Viola disputes the District Court's conclusion that EOUSA and the FBI performed adequate searches in response to his FOIA requests. The widely accepted standard for the adequacy of an agency's search comes from the D.C. Circuit's decision in *Oglesby v. United States Department of the Army*, 920 F.2d 57 (D.C. Cir. 1990).[10] That standard, which this Circuit has embraced, *see Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 182 (3d Cir. 2007), evaluates the adequacy of an agency's search for records responsive to a FOIA request by examining the agency's explanation, usually in the form of a sworn statement, in two respects: the completeness of the locations and files searched, and the methods used to search those locations and files, *see Oglesby*, 920 F.2d at 68. For the first criterion, the agency must demonstrate that it searched all locations and files "likely" to have responsive records. *Id.*; *see also Abdelfattah*, 488 F.3d at 182. For the second, the agency must show that its methods for searching those locations and files were "reasonably calculated" to find responsive records. *Oglesby*, 920 F.2d at 68; *see also Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *Morley v. Cent. Intel. Agency*, 508 F.3d 1108, 1114 (D.C. Cir. 2007);

---

[10] *See, e.g.*, *Maynard v. Cent. Intel. Agency*, 986 F.2d 547, 559 (1st Cir. 1993); *Am. C.L. Union Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 655 n.15 (2d Cir. 2023); *Ethyl Corp. v. U.S. Env't Prot. Agency*, 25 F.3d 1241, 1247 (4th Cir. 1994); *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010); *Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d 381, 387 (7th Cir. 2015).

14

*Abdelfattah*, 488 F.3d at 182.  Viola challenges the agencies' searches under both components of the *Oglesby* standard.

### a.  *The completeness of the locations searched*

Viola argues that EOUSA did not search all locations and files likely to have responsive records because it searched only his case file and the files of the Assistant United States Attorney who prosecuted his case.

Viola's characterization unfairly shortchanges EOUSA's search.  In its supporting declaration, EOUSA explained that it also searched its FOIA storage room, electronic folders, and a database within the United States Attorney's Office for the Northern District of Ohio, which it believed would locate "any and all records related to Mr. Viola or his business."  Cain Decl. ¶ 24 (JA671).  That suffices under the *Oglesby* standard.  And although Viola's FOIA request to EOUSA did not mention either Dawn Pasela or Kathryn Clover, EOUSA nonetheless searched the same database and the email of the AUSA who prosecuted Viola for records related to Pasela or Clover.  In addition, it specifically searched the United States Attorney's Office for "tapes, transcripts, or recordings" regarding Pasela or Clover.  *Id.* ¶ 30 (JA672).  By those actions, EOUSA discharged and indeed surpassed its FOIA obligations in terms of the locations and files that it searched, and this aspect of Viola's challenge is meritless.

With respect to the FBI, Viola argues that its explanation for the location it searched for responsive records – the Central Records System – was inadequate.  He contends that the FBI did not explain why it searched only its Central Records System.  *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 149 (D.C. Cir. 2016) ("[T]he agency must search and disclose records that [are] not on its premises but [are] under its 'constructive control.'" (quoting *Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996))).

15

Here, Viola has a point. The FBI explained that records responsive to his FOIA request "would reasonably be expected to be located in" its Central Records System. 3d Seidel Decl. ¶ 28 (JA746). At face value, the FBI's explanation is inadequate. The *Oglesby* standard requires more than a search of the locations "most likely" to have responsive records; it demands that an agency search *all* locations *likely* to have responsive records. *Oglesby*, 920 F.2d at 67–68 (citation omitted); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015) ("'[M]ost likely' is not the relevant metric."). And the FBI did not expressly 'close the loop' by stating that no location other than its Central Records System would likely have records responsive to Viola's FOIA request. *Cf. Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998) (recognizing that an agency has "discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return"); *see also Oglesby*, 920 F.2d at 68 (explaining that an agency need not "search every record system"). Nor is there a readily apparent basis for reasonably inferring such closure.[11] Thus, without closing the *Oglesby* loop either expressly or through reasonable inference, the FBI was not entitled to summary judgment as to the

---

[11] In *pro se* FOIA litigation in the District Court for the District of Columbia about separate FOIA requests, Viola unsuccessfully argued that the FBI had constructive control over records within the Task Force's possession. *Viola v. U.S. Dep't of Just.*, 2019 WL 2437692, at *3 (D.D.C. June 11, 2019) (concluding that "the [Task Force's] records are not subject to control by the EOUSA or any other federal entity"). The FBI now argues that under collateral estoppel, that issue cannot be relitigated here, and thus the scope of its search was adequate. But even if the Task Force was not reasonably likely to have FBI records within the FBI's constructive control, the FBI did not adequately indicate that the remainder of its record systems were not likely to have any responsive records.

adequacy of the locations and files that it searched. *See DiBacco*, 795 F.3d at 188.

### b. *The reasonableness of the agencies' search methods*

Viola also argues that neither EOUSA nor the FBI used reasonable methods to search the locations and files for responsive records.

He faults EOUSA because it searched only files relating to him for information about his company, Realty Corporation of America. EOUSA justified that approach on the premise that all records related to Realty Corporation of America would be in the same location as records related to Viola. It is not necessary to address the adequacy of EOUSA's justification, however, because a FOIA request must on its face reasonably identify the requested information. *See Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("The agency [is] bound to read [a FOIA request] as drafted, not as either agency officials or [the requester] might wish it was drafted."). And here Viola's FOIA request sought records "concerning . . . any matters involving [him] or [his] company" without identifying his company by name. EOUSA FOIA Req. (JA125). That is not a reasonably specific request, especially since Viola had ownership interests in multiple business associations. Because of that deficiency in the FOIA request itself, EOUSA was under no obligation to search for information related to Viola's unidentified company, and in attempting to locate records related to Realty Corporation of America, EOUSA again exceeded its FOIA search obligations. *See generally TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) ("[The Court] may affirm on any basis supported by the record, even if it departs from the District Court's rationale.").

Viola additionally asserts that EOUSA's search method was unreasonable because the Assistant United States Attorney whom Viola accused of misconduct was allowed to search for records regarding Pasela or Clover. Viola's suspicions as to

17

the AUSA's misconduct are based on the AUSA's resignation after an internal investigation. But, in tasking that AUSA – the one assigned to prosecute Viola – with partial responsibility for finding agency records regarding Viola or his company, EOUSA relied on the person with arguably the most knowledge about potentially responsive records to search for those records. And it takes more than a FOIA requestor's suspicions and accusations of an agency employee to render a FOIA search performed by that employee unreasonable. Even more, that AUSA was not the sole person responsible for searching those files: his legal assistant and the FOIA contact for the United States Attorney's Office for the Northern District of Ohio also conducted that search. Thus, EOUSA performed an otherwise reasonable search.

As to the FBI, Viola argues that its search method was deficient because it searched only files indexed by his name and his casefile. Viola contends that a broader search was needed for his requests for information about (i) Pasela's recordings of him; (ii) the FBI-302s dated after March 1, 2011, that specifically mentioned his name; (iii) emails from Clover to the FBI about him; and (iv) information regarding Pasela's death. With respect to the first three categories, Viola requested only those records pertaining to Pasela's recordings, FBI-302s, and emails from Clover that also mentioned his name, and so it was reasonable for the FBI to search only files indexed by Viola's name and his casefile. But as to records regarding Pasela's death, Viola's FOIA request was not limited to records that mentioned his name. Although this aspect of Viola's request was comparatively broader than the others, the FBI did not correspondingly expand its search method. Instead, it asserted that "[c]onsidering the nature of the specifically requested items, it is reasonable for the FBI to conclude that if such records existed in the [Central Records System], then they would be indexed to Plaintiff." 3d Seidel Decl. ¶ 30 (JA746–47). That statement does not explain *why* all of the records regarding Pasela's death would likely be indexed by Viola's name or in his casefile. And with that gap

18

in reasoning, the FBI failed to justify the reasonableness of its search in response to Viola's request for records relating to Pasela's death.

### 2. *EOUSA and the FBI did not sufficiently justify all of their assertions of FOIA exemptions.*

EOUSA withheld 272 pages in full and 225 pages in part based on Exemptions 3, 5, 6, and 7(C). The FBI withheld 6,877 pages in full and 1,099 pages in part based on Exemptions 3, 6, 7(C), 7(D), and 7(E). On appeal, Viola challenges EOUSA's and the FBI's assertions of Exemptions 6 and 7(C) and the FBI's assertions of Exemptions 7(D) and 7(E).

### a. *Exemptions 6 and 7(C)*

To protect the privacy interests of third parties mentioned in records responsive to Viola's FOIA requests, EOUSA and the FBI asserted Exemptions 6 and 7(C). Exemption 6 protects privacy generally by permitting an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) provides a greater degree of protection in the context of "records or information compiled for law enforcement purposes" by allowing agencies to withhold information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Although the textual scope of the two exemptions differs, both are evaluated by balancing "the public interest served by disclosure against the harm resulting from the invasion of privacy," with the balance more readily protecting information subject to Exemption 7(C) than Exemption 6 materials. *Int'l Bhd. of Elec. Workers Loc. Union No. 5 v. U.S. Dep't of Hous. & Urb. Dev.*, 852 F.2d 87, 89 (3d Cir. 1988); *see also Sheet Metal Workers Int'l Ass'n, Loc. Union No. 19 v. U.S. Dep't of Veterans Affs.*, 135 F.3d 891, 898 (3d Cir. 1998).

19

Those two exemptions were the ones most frequently asserted by the agencies in withholding information responsive to Viola's FOIA requests. EOUSA relied on at least one of those exemptions for 155 out of the 278 pages that it withheld in full and for redactions to all 225 of the pages that it released in part. The FBI always invoked Exemptions 6 and 7(C) in tandem, and they formed at least one of the grounds for each of the 6,877 pages it withheld in full and for all but five of the 1,099 pages it released in part.

Perhaps due to the frequency of the agencies' assertions of those exemptions, Viola's primary attack is general in nature: he contends that the agencies provided only "generic justifications" for invoking them. Viola's Opening Br. 43. But an agency's justification for FOIA redactions or withholdings is not deficient if it allows for meaningful challenges to the applicability of an exemption. *See Davin v. U.S. Dep't of Just.*, 60 F.3d 1043, 1049 (3d Cir. 1995) (explaining that "the agency's explanation [must be] full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding" (quoting *McDonnell v. United States*, 4 F.3d 1227, 1242 (3d Cir. 1993))); *see also Campbell*, 164 F.3d at 34 (explaining that the reviewing court must have enough factual information to perform a "meaningful" review).

Here, to justify their withholdings, the agencies produced *Vaughn* indexes and corresponding supporting sworn statements – in addition to the records that they produced with partial redactions. EOUSA's format for its *Vaughn* index is beyond reproach: it described each document subject to redaction and identified with particularity the basis for each privacy exemption through explanations such as "[s]ocial security number redacted" and "[n]ames and email addresses redacted." EOUSA 2020 *Vaughn* Index 1–2 (JA652–53). The FBI took a different approach – its *Vaughn* index provided a document-by-document, page-by-page description of its withholdings, and for purposes of Exemptions 6 and 7(C), it

20

grouped the persons whose information was redacted on privacy grounds into nine categories.[12] Such a grouping for an exemption's applicability is permissible if the agency's explanation specifically describes the categories and "correlate[s] the claimed exemptions to the withheld documents." *Davin*, 60 F.3d at 1051; *see also Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006) (asserting that an agency need not provide "repetitive, detailed explanations for each piece of withheld information"). The FBI's *Vaughn* index meets that standard.

Nor is there a broad problem with the agencies' supporting sworn statements. Those assessed the privacy interests for each person or category of persons, considered the public interests associated with the disclosure of that information, and then balanced the privacy interests against the public interests. It may be that in some instances those explanations do not justify a particular redaction or withholding in full, but both agencies' overall approaches to their exemptions allow for meaningful, specific challenges to individual redactions and withholdings in full. Thus, Viola's general challenge to the adequacy of the agencies' methods for justifying their assertion of FOIA exemptions fails.

---

[12] Those categories were "FBI Special Agents and Support Personnel"; "Non-FBI Federal Government Personnel"; "Local/State Law Enforcement Personnel"; "Local/State Government Personnel"; "Third Parties of Investigative Interest"; "Third Parties [W]ho Provided Information to the FBI"; "Third Parties Merely Mentioned"; "Third Party Victims"; and "Third Party Individuals [Whose Information Was Collected] by a Private Investigation Firm Hired by Anthony Viola." FBI 2020 *Vaughn* Index A-1–A-2 (JA841–42).

Consistent with that conclusion, Viola disputes four applications of Exemptions 6 and 7(C).[13] With respect to EOUSA, he contests its reliance on those exemptions with respect to marked trial exhibits; an ethics complaint that Viola made against his lawyer along with related correspondence; and witness statements and interviews. For the FBI, Viola challenges the redactions to a single document that it produced – handwritten notes from a third-party interview discussing Viola.

### i. The Withheld Trial Exhibits

As to EOUSA's documents marked as trial exhibits, Viola challenges the withholding of seven in full and the release of three in part based on Exemptions 6 and 7(C).

Some of those documents were identified as government exhibits. That is noteworthy because once a document is identified as a government exhibit for a public hearing, that indicates that the government has already weighed the public and private interests related to that document's disclosure and decided that, if helpful to the government, the information would become publicly known. In that circumstance, in which otherwise private information is ready for public release, much of the balancing required for Exemptions 6 and 7(C) has already been resolved – in favor of disclosure. Thus, when an agency seeks to withhold a document that has been identified as a government trial exhibit on the basis of Exemption 6 or 7(C), it must show not only that the exhibit was not used at a public trial but also that the reason for its non-use was grounded in personal privacy considerations as opposed to trial

---

[13] EOUSA and the FBI also explained that their withholdings in full of documents under Exemptions 6 and 7(C) were based on their conclusions that the remainders of those documents were not reasonably segregable from the exempted portions. Viola does not develop a challenge to those general assertions regarding reasonable segregability.

22

strategy. *But cf. Cottone v. Reno*, 193 F.3d 550, 556 (D.C. Cir. 1999) (holding that for purposes of Exemption 3 – statutorily protected information, *see* 5 U.S.C. § 552(b)(3) – there must be actual use of the exhibit at trial).[14] EOUSA has not provided such a justification here for the documents identified as government trial exhibits.

The remainder of the exhibits were identified as defense exhibits, and EOUSA has treated those as agency records in withholding information in them pursuant to FOIA exemptions. *Cf. generally U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144–45 (1989) (articulating criteria for agency records); *Project on Predatory Lending of the Legal Servs. Ctr. of Harvard L. Sch. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 638, 648–54 (W.D. Pa. 2018) (evaluating whether documents received by a United States Attorney's Office in civil discovery qualified as agency records). With little else known about those documents beyond their designation as defense exhibits and EOUSA's treatment of them as agency records, EOUSA has not provided enough information to balance privacy concerns against the public interest in their disclosure.

Thus, EOUSA has not met its burden of justifying the application of Exemptions 6 or 7(C) to documents identified as defense exhibits.

### ii. The Ethics Complaint and Correspondence with Disciplinary Counsel

Viola also contests EOUSA's redactions in three documents related to a grievance he filed against his attorney.

---

[14] EOUSA asserted Exemption 3 for two trial exhibits, but not ones for which it invoked Exemption 6 or Exemption 7(C), and Viola does not contest the application of that exemption.

The first document was a complaint about his attorney that Viola submitted to the Cleveland Metropolitan Bar Association. EOUSA invoked Exemption 6 to redact an address, date of birth, and home phone number. Those items implicate personal privacy concerns. *See Int'l Bhd.*, 852 F.2d at 89. While there may be some public interest in that information, there is little reason to believe that any such public interest increases the transparency of the operations of EOUSA or other federal agencies. And when the public interest in information has little bearing on the operations or activities of federal agencies, the balance more readily tips in favor of the privacy interests. *See U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 495 (1994) ("[T]he *only* relevant 'public interest in disclosure' to be weighed . . . is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of *the operations or activities of the government*.'" (third alteration in original) (first emphasis added) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989))); *Reps. Comm.*, 489 U.S. at 773 (explaining that FOIA was not designed to disclose "information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct"). Thus, EOUSA's redactions to this document were permissible.

That same analytical framework applies to the other two documents, which were letters from the Disciplinary Counsel of the Supreme Court of Ohio that EOUSA produced subject to redactions of the name and signature on the letter. The specific signatory of the letters from the Ohio Disciplinary Counsel sheds very little light on the "operations or activities" of a federal agency, and hence there is not a high degree of public interest in that person's identity. *Fed. Lab. Rels. Auth.*, 510 U.S. at 495 (emphasis removed) (quoting *Reps. Comm.*, 489 U.S. at 775). But Disciplinary Counsel is itself a public office in Ohio, *see* Office of Disciplinary Counsel of the Supreme Court of Ohio, *Frequently Asked Questions*, https://odc.ohio.gov/faq (choose "What is the Office of

24

Disciplinary Counsel?") [https://perma.cc/3YLM-VTMQ], and thus if the signatory were a public officeholder – as opposed to a staff member in that office – then there is little privacy interest that the public officeholder has in the correspondence sent from his or her office. Accordingly, the balance weighs in favor of disclosure if the signatory is a public official and against disclosure if the signatory is a staff member in that office. But here, because EOUSA has not provided additional details that would rule out a public officeholder as the signatory, it has not met its burden for justifying the redaction of that information from those two letters.

### iii. The Withheld Witness Statements and Interviews

Viola also contends that EOUSA improperly relied on Exemptions 6 and 7(C) to withhold fifteen witness statements and interviews in full and one in part to protect the identity of the witnesses. While the witnesses have some privacy interests in preventing the disclosure of their personally identifiable information in EOUSA's files, EOUSA did little to justify these withholdings – almost as if there were a FOIA exemption permitting the withholding of all witness statements. *Cf.* 5 U.S.C. § 552(b)(7)(D) (allowing the withholding of information related to confidential sources). Instead of providing a basis for any specific redactions,[15] much less for withholding the documents in their entirety, EOUSA stated that the documents contained information that was "inextricably intertwined" with the exempt information. EOUSA 2020 *Vaughn* Index 7 (JA658). Yet without additional context, such a conclusory statement has little persuasive value. *See Ferri v. Bell*, 645 F.2d 1213, 1217 (3d Cir. 1981) (explaining that privacy interests must be examined in context). In short, there is no recognized blanket rule that the balance of privacy concerns and public interests

---

[15] It did, however, clarify that for the document released in part, it redacted just the signature.

favors withholding witness statements, and the justifications offered by EOUSA for redacting and withholding in full the fifteen witness statements are insufficient.

### iv. The Handwritten Notes from a Third-Party Interview

Viola specifically challenges only one FBI document – handwritten notes from a third-party interview discussing Viola that the FBI withheld in part pursuant to Exemptions 6 and 7(C).  Viola challenges the redactions made to those notes on the ground that the interviewee appeared at times to refer to previous statements that Viola had made, and from there, Viola contends that the redacted portions of the notes must not contain any personally identifiable information.  That argument lies more in conjecture than sound logic, and it does not fare well against the concrete explanation that the FBI provided in its declaration, which was that the documents *did* contain personally identifying information about private individuals who were the targets of FBI investigations, cooperated with the FBI, were victims of Viola, or were otherwise mentioned in the files and would be harmed by the disclosure of their information.  Thus, Viola comes nowhere close to overcoming the FBI's justification for these redactions.

### b. *Exemption 7(D)*

To protect the identities of its confidential sources, the FBI invoked Exemption 7(D).  By its terms, that exemption authorizes withholding "records or information compiled for law enforcement purposes" that "could reasonably be expected to disclose the identity of a confidential source."  5 U.S.C. § 552(b)(7)(D).  In addition, it permits withholding "information furnished by a confidential source" when that information is compiled by a criminal law enforcement authority in the course of a criminal investigation (or a national security intelligence investigation).  *Id.*  The FBI applied

26

Exemption 7(D) to twenty-three FBI-302s,[16] thirty-two sets of handwritten notes used to prepare the FBI-302s,[17] four sets of notes of non-FBI-302 third-party interviews,[18] and fifteen documents related to third-party messages and financial documents.[19]

As with any exemption, an agency asserting Exemption 7(D) bears the burden of proving its applicability. *See U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 171 (1993); *see also* 5 U.S.C. § 552(a)(4)(B) (imposing the burden on an agency that withholds information responsive to a FOIA request to sustain the withholding). And here, Viola argues that the FBI did not satisfy one component of its burden with respect to its Exemption 7(D) withholding: proof that the identity of the source was confidential.

The confidentiality of a source is not presumed from that source's voluntary provision of information to a law enforcement agency. *See Landano*, 508 U.S. at 181 ("[T]he Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation."). Rather, for the FBI to demonstrate confidentiality, it must show that "the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *Id.* at 174.

---

[16] The FBI made redactions to sixty pages of the FBI-302s, and it withheld another thirty-one pages in full.

[17] The FBI made redactions to 141 pages of those handwritten notes, and it withheld ninety-six pages in full.

[18] The FBI made redactions to four pages, and it withheld none of those documents in full.

[19] The FBI withheld twenty-four pages of those documents in full.

The FBI can meet that standard by showing that it gave the source an express assurance of confidentiality or by relying on circumstances that make the assurance of confidentiality implicit. *See id.* at 172 (citing S. Rep. No. 93-1200, at 13 (1974)); *Davin*, 60 F.3d at 1061.

In this appeal, the FBI does not argue that it gave any source an express assurance of confidentiality; instead, it contends that under the circumstances, the sources received implied assurances of confidentiality. The Supreme Court has recognized two circumstances in which an implied assurance of confidentiality may be inferred: the "character of the crime at issue" and the "source's relation to the crime." *Landano*, 508 U.S. at 179. Both of those circumstances are 'FOIA workable' in the sense that they do not necessarily require an agency to disclose additional exempted or otherwise confidential information to justify a withholding or redaction. *See id.* at 180 (emphasizing the importance of workable FOIA standards to minimize "the extent that the Government's proof" that an asserted exemption applies "may compromise legitimate interests"); H.R. Rep. No. 89-1497, at 6 (1966) ("It is vital to our way of life to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.").[20] For the first recognized circumstance, when the character of the crime at issue is publicly known, it may be possible to infer serious dangers associated with providing information to law enforcement, and thus, an agency need not disclose any exempted or otherwise confidential information to justify an

---

[20] *Cf. Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279, 294 (2d Cir. 1999) (explaining that a "workable solution" involves supporting withholdings with information "that is not only specific enough to obviate the need for an *in camera* review[] but that also enables the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted documents for itself").

implied assurance of confidentiality for purposes of Exemption 7(D). *See Landano*, 508 U.S. at 179 (opining that an implied assurance of confidentiality may be reasonably inferred when the source witnessed a gang-related murder). Similarly, the source's relation to the crime can be FOIA workable. If a source provides evidence against an organization known for "engag[ing] in acts of violence or harassment[] or threaten[ing] to do so," then an implied assurance of confidentiality may be inferred for that source. *Davin*, 60 F.3d at 1063.

The FBI, however, does not rely on either of those FOIA-workable circumstances for implying an assurance of confidentiality. Instead, it contends, first, that the information provided by the sources is singular such that knowing the information would reveal the identity of the source and, second, that the consequences for disclosing the source's identity would be "disastrous." 3d Seidel Decl. ¶ 70 (JA770). The FBI is correct that, if proven, singularity of information coupled with disastrous consequences for the source would allow a reasonable inference that the source of the singular information received an implied assurance of confidentiality. The drawback of the singularity-plus-consequences approach to Exemption 7(D) is that additional details are needed to establish singularity and the disastrous consequences therefrom. Singularity requires evidence, at least at a general level, that only the source could have provided the information. And the forecasted disastrous consequences must be identified and be caused by persons or groups who could ascertain the source from the singularity of the information provided. Because those extra layers of detail – many of which may themselves be confidential – are needed to establish the singularity-plus-consequences method of implying an assurance of confidentiality, that approach is not nearly as FOIA workable as the two circumstances recognized by the Supreme Court from which an assurance of confidentiality can be inferred. Thus, when a law enforcement agency relies on a singularity-plus-consequences approach to demonstrate an

29

implied grant of confidentiality, it will need to supply additional evidence for its position, and that may entail *in camera* submissions. *See Landano*, 508 U.S. at 180 (recognizing that when "the Government's proof may compromise legitimate interests, . . . the Government still can attempt to meet its burden with *in camera* affidavits").

Here, setting aside its wholly conclusory statements about singularity and disastrous consequences, the FBI, which did not make any *in camera* submissions, has not provided the factual details needed to support a reasonable inference of an implied grant of confidentiality. The FBI's sworn statements and *Vaughn* indexes do not identify the number of confidential sources. That alone renders impossible any meaningful singularity analysis, since singularity necessarily depends on there being a sole source for the information provided. The FBI likewise does not indicate how the persons or groups who could recognize the source from the information provided would be likely to retaliate against the source – let alone inflict disastrous consequences on the source.

In sum, the FBI's approach to implying an assurance of confidentiality is not as FOIA workable as the two narrow circumstances identified by the Supreme Court, and here, the FBI does not provide the comparatively greater amount of support needed to justify the conclusion that the sources received an implied assurance of confidentiality. And without demonstrating that any of the information was properly redacted, the FBI has also failed to establish that it has produced all reasonably segregable non-redacted information in response records. *See Davin*, 60 F.3d at 105; *see also Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Thus, neither its specific redactions nor its withholding of pages in full under Exemption 7(D) can be sustained on this record.

c. *Exemption 7(E)*

The FBI also asserted another of the law enforcement exemptions, Exemption 7(E), with respect to five categories of information. *See generally Davin*, 60 F.3d at 1051 (permitting agency use of categorical identifiers for FOIA exemptions). That exemption allows withholding information in agency records related to "techniques and procedures for law enforcement investigations or prosecutions, or . . . guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

On appeal, Viola challenges the FBI's use of that exemption as to one of the identified categories of information. The FBI designated that category as "(b)(7)(E)-7" and described it as referring to search results from the National Crime Information Center's database concerning information that was requested by and provided to law enforcement agencies. FBI 2020 *Vaughn* Index A-2 (JA842).[21] The FBI identified twenty-two documents, totaling twenty-seven pages, within that category, and those were dated either April 29 or April 30, 2009.

To justify its withholding in full of those documents, the FBI relied only on the techniques-and-procedures prong of

---

[21] The FBI provided the following descriptions for the four other categories of information that it was withholding under Exemption 7(E): Category (b)(7)(E)-1 for the effectiveness rating of statistical information contained in FBI Internal Database Form FD-515; Category (b)(7)(E)-5 for the collection, methodology, and analysis of investigative information obtained during searches of internal FBI databases; Category (b)(7)(E)-8 for internal FBI secure email, IP addresses, and internet/web addresses; and Category (b)(7)(E)-9 for Computer Analysis Response Team examination results.

Exemption 7(E) – not that exemption's guidelines prong.[22] The techniques-and-procedures prong does not apply to "routine techniques and procedures already well-known to the public, such as ballistic tests, fingerprinting, and other [common] scientific tests" but rather only to techniques and procedures that are not widely known. *Ferri*, 645 F.2d at 1224; *see also Davin*, 60 F.3d at 1064. In support of its application of Exemption 7(E) to the NCIC reports, the FBI averred that the release of those specific database reports would allow individuals to "surmise what agency and when and how that agency was able to obtain information concerning their criminal activities." 3d Seidel Decl. ¶ 87 (JA780).

The problem for the FBI is that its justification for applying Exemption 7(E) requires an extension of the plain text of the statute. *See* 5 U.S.C. § 552(b)(7)(E). A request by a law enforcement agency for information from the NCIC database is itself a technique or procedure – and one that the FBI readily acknowledges, which makes it a technique or procedure common enough to fall outside of the protection of Exemption 7(E). Indeed, the FBI is not trying to protect disclosure of the practice of law enforcement agencies making requests to the NCIC database; instead, it attempts to withhold the *results* of that well-known technique. But without more, neither the specifics of a NCIC search request – including the identity of the requesting entity, the date of the request, and the

---

[22] *See Davin*, 60 F.3d at 1064 (interpreting the requirement that "disclosure could be reasonably expected to risk circumvention of the law" as applying to the techniques-and-procedures prong as well as the guidelines prong (quoting 5 U.S.C. § 552(b)(7)); *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 42 (D.C. Cir. 2011) (same). *But see Grey v. Alfonso-Royals*, 140 F.4th 173, 179 (4th Cir. 2025) (interpreting the requirement as applying to only the guidelines prong); *Hamdan v. Dep't of Just.*, 797 F.3d 759, 778 (9th Cir. 2015) (same); *Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010) (same).

nature of the request – nor the details of the search result can be fairly understood as a law enforcement technique or procedure.

Tellingly, the FBI does not make that argument. Instead, it attempts to justify its application of Exemption 7(E) to information related to NCIC database searches by emphasizing that "[p]ublic confirmation of NCIC queries would alert individuals that they may be the subject of an investigation by a particular law enforcement agency." 3d Seidel Decl. ¶ 87 (JA780). That is certainly a legitimate law enforcement concern. But Congress separately accounted for that interest with Exemption 7(A), which applies when the production of "law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7); *see also NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 225 (1978) (explaining that Exemption 7(A) applies not only to active litigation but also to investigations). And in moving for summary judgment in 2017, the FBI did not assert Exemption 7(A) over the NCIC database search results from April 2009. The potential application of Exemption 7(A) to preserve the interests the FBI identifies coupled with its non-assertion here confirms that it is incorrect to extend Exemption 7(E) beyond its text so that it would cover not only techniques and procedures but also the results of the everyday application of widely known law enforcement techniques and procedures. *See Davin*, 60 F.3d at 1064 (rejecting the FBI's assertion of Exemption 7(E) over well-known techniques unless the government offers specific evidence that the information would risk circumvention of the law). Accordingly, the FBI has failed to justify its application of Exemption 7(E) to the identified documents. In addition, because the FBI did not attempt to segregate exempted material from nonexempted material within the NCIC results, its justification for withholding in full is likewise inadequate.

### C. Viola's challenge to the adequacy of the District Court's summary judgment opinion is unsuccessful.

Viola additionally disputes the adequacy of the District Court's explanation for its decision granting summary judgment in favor of the federal agencies. His argument is premised on a supervisory rule announced in *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969 (3d Cir. 1981), which requires that district courts "state explicitly the legal basis as well as the findings that are necessary to demonstrate that the documents are exempt or disclosable under the FOIA." *Id.* at 980. But a district court's findings of fact and conclusions of law, while helpful, are not essential when an appellate court engages in *de novo* review because that form of review is a fresh look, undertaken as if there had been no prior district court decision. *See Choctaw Nation v. United States*, 119 U.S. 1, 30 (1886) (explaining that *de novo* review involves review "from the beginning, and as if the [case] were new and had freshly arisen" in that court); *cf.* Fed. R. Civ. P. 52(a)(1) (requiring district courts to make findings of fact and conclusions of law in cases tried "without a jury or with an advisory jury"). And indeed, on *de novo* review of the District Court record in this case, it was possible to resolve each of Viola's challenges. Thus, any error by the District Court in its explanation was harmless. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Morgan v. Covington Township*, 648 F.3d 172, 180 (3d Cir. 2011) ("[A]s . . . the Federal Rules of Civil Procedure . . . make clear, '[a]n error that is harmless is not grounds for disturbing a judgment.'" (alteration in original) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1214 (D.C. Cir. 1997))). So because the most that Viola could establish would be harmless error, his challenge to the adequacy of the District Court's explanation fails.

34

## IV. CONCLUSION

For these reasons, the District Court's orders will be affirmed in part, vacated in part, and remanded for further proceedings. In particular, the District Court's order granting the Task Force's motion to dismiss for a lack of personal jurisdiction is affirmed. The order granting summary judgment for EOUSA is affirmed with respect to its search obligations but vacated and remanded with respect to its redactions and withholdings in full of trial exhibits, correspondence with disciplinary counsel, and witness statements based on Exemptions 6 and 7(C). The order granting summary judgment for the FBI is affirmed with respect to its search for records related to Pasela's recordings, FBI-302s, and Clover that mentioned Viola's name, as well as to its redactions and withholdings under Exemptions 6 and 7(C). But it is vacated and remanded with respect to the locations searched, the method of searching for records relating to Pasela's death, and the FBI's redactions and withholdings in full under Exemptions 7(D) and 7(E). Because only EOUSA and the FBI – not Viola – moved for summary judgment, on remand, Viola may move for summary judgment, and the District Court may, in its discretion, permit EOUSA and the FBI to move for summary judgment again, based on revised searches, explanations, and segregability analyses, for the remanded portions of this case.

35